UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

****************************************************************************************************

In re:

SARA BETH BROWN,

           Debtor.

ORDER DENYING DEBTOR'S MOTION
FOR VALUATION OF CLAIM OF
HOMETOWN CREDIT UNION AND
DENYING CONFIRMATION OF PLAN

BKY 14-35096

****************************************************************************************************

At St. Paul, Minnesota
September 11, 2015.

       The Debtor in this case filed for relief under Chapter 13 on December 30, 2014. At that time, she owned a house (including the underlying real estate) in Faribault, Minnesota. For her bankruptcy filing, she scheduled two creditors' claims as secured by mortgage liens against the real estate: one held by Green Tree Servicing, LLC and one held by HomeTown Credit Union.[1] The Debtor assigns the priority of these creditors' mortgages in that order--i.e.. HomeTown's as second.

       In her plan, the Debtor proposed to use the remedy of "lien stripping" against HomeTown's claim--that is, to apply 11 U.S.C. §§ 1322(b)(2) and 506(a)(1) so as to

> (1) have the creditor's claim reclassified from secured
> to unsecured, (2) modify the terms of the mortgage
> for the duration of the Chapter 13 plan, and (3) avoid
> the creditor's mortgage entirely upon discharge from
> bankruptcy.

*In re Schmidt*, 765 F.3d 877, 879 (8th Cir. 2014). Pursuant to Loc. R. Bankr. P. (D. Minn.) 3012-1, the Debtor brought a motion to have HomeTown's secured claim valued at zero, consistent with the

---

[1] The Debtor gives the name of the latter creditor as "Home Town Federal Credit Union" throughout her submissions. The creditor self-identifies as HomeTown Credit Union in its submissions. For brevity, it will be termed "HomeTown" after this.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *09/11/2015*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

theory of lien stripping.[2] As the local rule requires, the motion came before the court in conjunction with the hearing on confirmation of her plan.[3]

HomeTown opposed the motion and objected to confirmation. It framed two major grounds for its opposition.[4]

The first was fact-based; it went to the value of the house and hence the status of both secured creditors' claims in this case. HomeTown asserted that the value of the property as of the relevant time[5] was greater than the outstanding balance of the debt secured by the first mortgage. Hence, HomeTown argued, its junior mortgage[6] attached to some value in the property. Were this true as a matter of fact, it would deprive the Debtor of the fundament for the lien stripping remedy--a lien that did not attach to value in collateral at the relevant time, and hence a claim in favor of the lienor that in the context of bankruptcy had no secured "component" under the application of § 506(a). *See In re Schmidt*, 765 F.3d at 881-882.[7]

These parties' controversy was received at a first hearing held during a routine monthly calendar for Chapter 13 matters. Hence, this evidence-dependent issue was set aside to confront a deeper one that HomeTown presented as a matter of law.

---

[2]The Debtor relies on her assertion that the house is "real property that is [her] principal residence," Local Rule 3012-1(a). HomeTown does not dispute this.

[3]Jonathan K. Reppe appeared for the Debtor. Bradley J. Halberstadt appeared for HomeTown. Margaret J. Culp appeared for the Standing Trustee.

[4]The court held the Debtor's counsel to task for several content-related deficiencies in the plan and motion he had presented: a citation to "522(f)(1) or 522(f)(2)" as the substantive authority for the proposed avoidance of lien; the failure to include an owners-and-encumbrances report in the record for the motion, for proof of mortgage lien priority; and sloppiness in proving up the accuracy of addresses used for his service of the motion on alleged holders of mortgage liens. The imposition of consequences for these shortcomings was deferred due to the gravity of HomeTown's substantive objections.

[5]Here, in view of the presiding judge, that relevant time would be in December, 2014, when the Debtor filed her Chapter 13 petition---as 11 U.S.C. § 502(b) would prescribe for the valuation of any claim.

[6]All parties have treated these disputes premised on that priority for HomeTown's lien; and so it will be assumed for this analysis.

[7]Under *Schmidt*'s further reasoning, a claim associated with a mortgage against a debtor's principal residence that is bifurcated between a secured component that is "valueless" and an unsecured component valued at the full amount of the debt, is not protected by the shelter from modification otherwise given by 11 U.S.C. § 1322(b)(2). 765 F.3d at 881-882.

2

The second issue dates to the genesis of HomeTown's lien. On the date that HomeTown received its current lien--April 3, 2006--the Debtor was married. She and her then-husband held title to the real estate as joint tenants.[8] The Debtor and her then-husband jointly granted the mortgage to HomeTown to "secure[ their joint] indebtedness under a credit agreement which provid[ed] for a revolving line of credit" from HomeTown.[9]

But at some point the Debtor and her husband got divorced.[10] On November 6, 2014, he executed a quit claim deed to convey his interest in the property to the Debtor. This deed was recorded a week later.[11] HomeTown now asserts that the Debtor's ex-husband remains personally liable on the underlying debt. There is no evidence in the record that HomeTown released him at any time--the Debtor certainly has not produced anything to support that--so this point must be taken as undisputed also.

The Debtor invokes the lien stripping remedy on its own tenet, that a "claim" associated with a pre-petition mortgage is not to be treated as a secured claim for the purposes of administration under Chapter 13, if it did not attach to some value in the underlying collateral when the bankruptcy case was commenced; and once payment under a plan is completed with the mortgagee treated entirely as an unsecured claimant, the mortgage may be avoided "entirely upon discharge from bankruptcy." *In re Schmidt*, 765 F.3d at 879 (citing *Harmon v. United States*, 101

---

[8] Warranty Deed, Lynn R. Rost to Sara Brown and Daniel Brown (dated November 1, 2002), part of Exhibit A to the Debtor's motion [Dkt. No. 13].

[9] The couple's last grant of a "revolving credit mortgage" to HomeTown took place on April 3, 2006. (There had been at least one such secured revolving-credit transaction earlier, between those parties and involving the same real estate. That mortgage was released in conjunction with the grant of this one.) The mortgage instrument executed on that date (part of Exhibit A to the Debtor's motion) refers to both of the named mortgagors as "Borrowers." The agreement for this "open-end residence-secured credit plan" is also dated April 3, 2006. It is an exhibit to HomeTown's objection [Dkt. No. 17]. It bears the signatures of both the Debtor and her then-husband.

[10] Neither party put a divorce decree into the record. But both sides refer to the dissolution of the marriage having taken place pre-petition; and hence there is no dispute over the point.

[11] Quit Claim Deed, Daniel Leonard Brown to Sara Beth Brown (dated November 6, 2014), again part of Exhibit A to the Debtor's motion.

3

F.3d 574, 582 (8th Cir. 1996)).  But for the specific history of pledge and ownership here, that outcome would be possible on the right proof of value.

However, the history at bar put the property into a specific posture as HomeTown's collateral, as of the Debtor's filing under Chapter 13: it still secured her ongoing liability to HomeTown, *and* her ex-husband's continuing personal debt obligation to HomeTown.  The former gave rise to a "claim" that nominally came within *Schmidt*'s ambit--i.e., in theory, it could be modified through the use of Chapter 13's remedies.  *The latter did not.*  The lien stripping remedy could not extend to the whole of HomeTown's lien as it encumbered the interest that the Debtor held in the real estate, even though she held full ownership in it when she filed under Chapter 13.  The Debtor took title to her ex-husband's undivided one-half interest in the property once he executed and delivered the quit claim deed to her; but that conveyance carried HomeTown's lien with the ex-husband's interest as it had attached to *that* interest.

It is not necessary to get into the abstract inquiry of whether lien stripping might still lie to divest HomeTown's lien, to the extent that it nominally secured *the Debtor's* liability on the underlying debt.  In the end, lien stripping simply cannot divest the lien to the extent that it continues to secure the ongoing liability of the Debtor's ex-husband.  *His* liability to HomeTown is not a debt matchable to a claim that is allowable or cognizable in the bankruptcy case of a third party to that debt--i.e. the Debtor.

There are several alternate paths of support for this conclusion.[12]  The most accessible way starts by recognizing the posture of the real estate as collateral security for debt, as it stood on the Debtor's Chapter 13 filing.

Tracing is the key to that.  As follows:

> 1. When the Debtor and her then-husband granted the mortgage to HomeTown in 2006, each of them held an undivided one-half interest in the property.  *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n*, 161 N.W.2d 688, 690 (Minn. 1968); *In re Holman*,

---

[12]HomeTown's counsel goes on for 21 pages in post-hearing briefing, to outline several of them.

4

        286 B.R. 882, 884 (Bankr. D. Minn. 2002). Each of them granted the mortgage against his or her own individual interest in the property. *Application of Gau*, 41 N.W.2d 444, 447 (Minn. 1950) (recognizing that statutory lien may attach to one joint tenant's undivided fractional interest, but holding that such attachment alone does not sever joint tenancy). Collectively, they did so to secure their joint and several liability by pledging the real estate. The grant of lien by each necessarily attached only to that grantor's undivided one-half interest, even though the result left the full fee interest subject to encumbrance to secure a joint and several liability.

2.     To the extent that the mortgage had attached to secure the liability of the Debtor's ex-husband, that encumbrance survived the divorce process. Under Minnesota law, the court in a proceeding for dissolution of marriage has no jurisdiction over third-party creditors or their interests in collateral security on any debt of the parties that was incurred during the term of the marriage.[13] In other words, the court in a divorce proceeding cannot compel a creditor to collect a debt contracted jointly by the spouses in the first instance, from only one spouse after the divorce; and it cannot compel a third-party creditor to release its security on any terms other than those of the original grant.

---

[13] Although this is virtually a black-letter principle in the day-to-day application of divorce and debtor-creditor law in Minnesota, there does not seem to be an appellate pronouncement on this specific point. The bedrock lies in an old recognition of the limitations on the state court's jurisdiction and adjudicatory power: in Minnesota the remedy of dissolution of marriage is purely statutory, and the trial court has only the powers strictly delegated to it by statute. *State ex. rel. Gravelle v. Rensch*, 40 N.W.2d 881, 884 (Minn. 1950); *Kienlen v. Kienlen*, 34 N.W.2d 351, 354 (Minn. 1948); *Warner v. Warner*, 17 N.W.2d 58, 67 (Minn. 1944); *Sivertsen v. Sivertsen*, 269 N.W. 413 (Minn. 1936). *See Melamed v. Melamed*, 286 N.W.2d 716, 718 (Minn. 1979) (reversing trial court on its award of interest in marital property to the children of the divorcing spouses, because at that time "no [Minnesota] statute confer[red] such authority on the court"). The procedure and substance of dissolution of marriage is governed by Minn. Stat. C. 518. That statute has no provision allowing the family court to extend its jurisdiction beyond that over the spouses, their children, and their property. In particular, there is no grant of judicial authority directly over third-party creditors of the spouses. (On similar thinking, the Minnesota Court of Appeals has reversed trial courts on several occasions, on adjudications within divorce proceedings that affected or determined the property interests of third parties who were not the spouse-parties to the divorce proceedings. *Kellen v. Kellen*, No. A11-1789, 2012 WL 3263788, at *6 (Minn. Ct. App. Aug. 13, 2012); *Danielson v. Danielson*, 721 N.W.2d 335, 339 (Minn. Ct. App. 2006); *In re Marriage of Sammons*, 642 N.W. 2d 450, 457 (Minn. Ct. App. 2002); *Fraser v. Fraser*, 642 N.W.2d 34, 38 (Minn. Ct. App. 2002)).

3. The divorce court can allocate the responsibility for the post-divorce payment of joint or marital debts, as between the divorcing spouses. As a matter of standard practice in Minnesota, this allocation is cemented through hold-harmless provisions that give a right of indemnification to a spouse who later suffers prejudice from the creditor's action when the spouse to whom a debt was allocated does not comply with the allocation.[14] But it cannot order a creditor to release an ex-spouse from jointly-contracted debt that is allocated to the other ex-spouse. And more to the point, such an allocation between the parties to the marriage does not per se release either party from liability to the creditor on debt allocated to the other ex-spouse. By extension, the allocation of marital property to one spouse does not per se release it from an encumbrance previously granted by a non-recipient spouse to secure the non-recipient spouse's debt to a third-party creditor.

4. When the Debtor's ex-husband consummated the property division by giving her the quit claim deed, she received no more than the interest he held in the property at that time. *Flowers v. Germann*, 1 N.W.2d 424, 428 (Minn. 1941) (grantee under quit claim deed can claim no more or better title than that held and passed by grantor). *See also Caughie v. Brown*, 93 N.W. 656, 657 (Minn. 1903) (quit claim deed passes such rights and interests as grantor possessed at time, but grantor does not affirm that grantor has any title whatsoever). Thus the Debtor's ex-husband's conveyance gave the Debtor the other undivided one-half interest, but subject to HomeTown's mortgage. She did not assume any of his personal liability to HomeTown by taking the conveyance. *Pratt v. Martig*, 234 N.W. 464, 465 (Minn. 1931) (acceptance of quit claim deed did not make grantee personally liable for payments required under contract for deed made by grantor). But to equal significance, the

---

[14] The rationale for dividing the burden of marital debt in dissolution proceedings is that it is an extension of the division of marital property between the divorcing spouses. *Filkins v. Filkins*, 347 N.W.2d 526, 529 (Minn. Ct. App. 1984). *See also, e.g.*, *Lenz v. Lenz*, 409 N.W.2d 68, 69 (Minn. Ct. App. 1987); *Wehner v. Wehner*, 374 N.W.2d 569, 571 (Minn. Ct. App. 1985).

6

        conveyance to her had no effect on the prior pledge of his interest to HomeTown.

5. As a result, after the undivided one-half interest that the Debtor's ex-husband held in the real estate passed to the Debtor post-dissolution, that interest was still pledged for the debt on which he had been--and continued to be--jointly and severally liable.

6. When the Debtor filed under Chapter 13, the real estate still secured the debt of the Debtor's ex-husband to HomeTown. It did so to no less extent than it secured the Debtor's debt to HomeTown.

The Debtor's argument for the application of lien stripping elides that crucial point.

In sum, her argument is that her receipt of her ex-husband's interest gave her "[t]he subject property, in its entirety," which "became part of the bankruptcy estate when [she] filed her . . . petition" under Chapter 13. As she would have it, with "the bankruptcy court attain[ing] authority over the identified [bankruptcy] estate," the Debtor's full interest in the real estate became subject to all Chapter 13 remedies. Lien stripping thus would lie as to her interest, against all encumbrances of junior priority that attached to the property at that time.

This argument coasts over the surface of the basis for lien stripping in case law, drawing on little more than its bare conclusion. The Debtor relies almost exclusively on the current repose of the real estate in the bankruptcy estate, but her argument ignores the basic statutory bricks from which the lien stripping remedy is structured.

In particular, the Debtor does not acknowledge the centrality of the concept of "claim" in the rationale for the remedy. Lien stripping functions to give final effect to the treatment of *claims* under a Chapter 13 plan. The Debtor may subject HomeTown's rights and its collateral to the Code's remedies through her personal bankruptcy case, only if HomeTown's rights match to a "claim" subject to bankruptcy processes in that case. Does the full array of HomeTown's rights match in this way, so as to subject them to complete divestiture through lien stripping?

7

The Code's provisions provide an opening framework on which to treat these questions, though it requires some digging and some abstraction:

7. Under the Bankruptcy Code, "claim" means "right to payment." It does not matter "whether . . . such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . ." 11 U.S.C. § 101(5). In turn, "'debt' means liability on a claim." 11 U.S.C. § 101(12).

8. The definitional provisions of 11 U.S.C. § 101 do not answer the question of where the "liability on a claim" must lie in order for the claim to be subject to allowance and treatment in a bankruptcy case. That is addressed by 11 U.S.C. § 502(b)(1), which provides that a claim asserted through a filed proof of claim [11 U.S.C. § 502(a)] may be disallowed "to the extent that . . . such claim is unenforceable *against the debtor and property of the debtor*, under any agreement or applicable law . . ." (emphasis added).

9. As to a "claim" in the sense of a right to payment founded on *in personam* liability, negative inference makes one thing clear: the debtor in bankruptcy via the case in which the status of the claim is at issue must be personally liable on the claim--i.e. must personally owe the debt--for the claim to be allowed, treated, or otherwise given cognizance for remedies available to that debtor in the case or for the administration of the estate in the case.

10. Under the Bankruptcy Code, however, the concept of a "claim" that may be subjected to bankruptcy processes goes beyond a creditor's rights against a debtor *in personam*. A complex of legal rights enforceable against a debtor's property--i.e. a lien with associated remedies against the property--gives rise to a "claim" that may be subjected to treatment under a Chapter 13 plan at the debtor-owner's instance, even if the debtor has been relieved of the originally-contracted personal liability on an underlying debt for which the lien was originally granted as security.

> *Johnson v. Home State Bank*, 501 U.S. 78, 83-87, 111 S.Ct. 2150, 2154-2155 (1991). This results from the substance of § 502(b)(1), plus the rule of construction in 11 U.S.C. § 101(2), that "'claim against the debtor' includes claim against property of the debtor." *Id.*[15]

On a superficial reading, *Johnson v. Home State Bank* might be taken as support for the Debtor's invocation of lien stripping against HomeTown's mortgage as a whole, and in particular as to the divestment of the lien to the extent it still secures her ex-husband's debt to HomeTown. The Debtor has no personal obligation in her ex-husband's right--i.e. his debt is separate from hers in the sense that the full obligation is several as well as joint--and HomeTown has no ultimate personal recourse against her on account of *his* debt. As this line of reasoning would go, the ex-husband's original pledge of his interest in the property was "nonrecourse" as to her; and the property as she now holds it is security for a debt of his as to which she is not personally liable.[16]

All of the Supreme Court's analysis, however, was prompted by a situation where a debtor originally pledged property of his own to a creditor as collateral for an extension of credit, but the debtor himself had no *in personam* obligation of payment to the creditor-secured party by the time bankruptcy remedies were brought to bear on the creditor's pre-petition rights. The debtor in *Johnson v. Home State Bank* originally had *in personam* liability on the debt, but then was relieved of it by an intervening receipt of discharge in bankruptcy under Chapter 7. 501 U.S. at 79, 111 S.Ct. at 2151. The *Johnson* court concluded that these facts nonetheless required the

---

[15]Further, in the Supreme Court's view the notion of a claim in bankruptcy arising from a creditor's *in rem* rights against a debtor's property alone, notionally ties back into the cash-associated concept of a "claim" that can arise from a debtor's *in personam* liability:

> Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property.

501 U.S. at 83, 111 S.Ct. At 2154.

[16]The Debtor's counsel never cited *Johnson v. Home State Bank* and did not suggest that the analysis could go this deeply. Nonetheless, the authority is there and the structure of its analysis means it must be confronted.

recognition of a claim, as conceived in bankruptcy law, solely on the continuing attachment of the security interest to the debtor's property.

In part, *Johnson v. Home State Bank* relies on the legislative history for § 102(2), which grounded its rule of construction on the notion of "nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally." 501 U.S. at 86, 111 S.Ct. at 2155 (citation and interior quotes omitted). The court acknowledged that the case before it had not featured a secured loan that was nonrecourse from the beginning; but in its view the intervening discharge from personal liability left Home State Bank, the secured party, with an "interest [in its collateral that had] the same properties as a nonrecourse loan." *Id.* Relying on the breadth of the language of § 102(2), with its lack of an express limitation to loans nonrecourse *ab initio*, the *Johnson* court stated that "Congress' [sic] intent [was] that § 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence." *Id.*[17]

In framing that "understand[ing]," the Supreme Court rejected the lower appellate court's concern that the parties "did not conceive of their credit agreement as a nonrecourse loan when they entered into it." *Id.* Again, this ruling in isolation could be used to swat away HomeTown's insistence on retaining all rights it was granted by the Debtor's ex-husband, regardless of the fact that the collateral on his debt--the interest in property that he pledged--later came to repose in the Debtor's ownership.

But once again, a more holistic take on the Supreme Court's analysis requires a deeper recognition: Congress pondered the origin of nonrecourse financing in "agreements," i.e. consensual arrangements between lender and borrower. The single word "agreements" has signal significance here, because it draws attention back to secured creditors' proper expectations in granting credit on the assurance of collateral. It also resonates with the notion behind § 502(b)(1),

---

[17]Or, in one commentator's view, ". . . the functional equivalent of a nonrecourse mortgage qualifies as a claim subject to treatment in a bankruptcy case because of the breadth of the definition of claim in [11 U.S.C.] § 101 . . ." K. KLEE, BANKRUPTCY AND THE SUPREME COURT (2008), 100.

10

that some sort of undertaking *by the debtor who ends up in bankruptcy* must lie in the past of a "right to payment," in order for that to give rise to a "claim" that is cognizable in bankruptcy and subject to bankruptcy's remedies at that debtor's instance.

Bankruptcy, of course, is as American as apple pie; and its pervasiveness has been an undeniable feature of the American consumer and commercial economies for decades. It is not possible for an institutional lender in the United States to extend credit without an awareness that its borrower might end up financially distressed and in bankruptcy.

Hence, lenders must be deemed to be on notice that the full range of statutory remedies in bankruptcy might be taken against the interests they take in connection with grants of credit. The prospect of bankruptcy has to--and does--go into the mix of considerations when any creditor makes its decision to lend. A lender may account for it in many ways--the identity and value of collateral demanded, interest rate, amortization, and the like. The risk from bankruptcy may be just the generalized one of discharge of debt and no return in liquidation, or it may be specific as to remedies that might be taken against a lender's particular interest in collateral. But whatever the risks to an individual borrower, lenders undeniably bear the potential consequences in a loss of their investment in a grant of credit.[18]

However, that assumption of risk goes to each borrower individually in a multi-borrower extension of credit. Rights to payment or collateral separately granted by a co-borrower stand on their own, as to legal enforceability and economic expectation. Lenders are properly deemed to have relied on all separate sources of recourse on default until they are paid in full. In construing the proper scope of bankruptcy remedies at the behest of a debtor in bankruptcy, it is neither fair nor efficient in the law-and-economics sense to extend such remedies beyond the creditor's earlier undertaking as to *that* borrower.

This analysis makes sense out of the congressional reference to "nonrecourse loan agreements." Under *Johnson*'s analysis of statutory definition and rule of construction, all of a

---

[18]This observation has nothing to do with borrower fraud, the consequences of which are dealt with in bankruptcy under 11 U.S.C. § 523(a) and other Code provisions.

11

creditor's recourse--against the debtor in bankruptcy itself (*in personam*) and that debtor's property pledged as collateral (*in rem*)–is in play. But as Congress recognized in its choice of expression, the vulnerability of such rights must be limited to those granted *under agreement with the borrower that is later in bankruptcy*--that is, taken by a creditor expressly in mind of the liability of that borrower and that borrower's property. A creditor may extract personal liability, security, or both from a borrower as a matter of agreement; and when it does it shoulders all consequences of a bankruptcy filing by that borrower. However, in the bankruptcy case of one co-borrower a creditor can not suffer the loss of its recourse to collateral originally granted to it by a co-borrower on the same transaction, on the mere happenstance that the borrower-in-bankruptcy acquired title to that collateral before going into bankruptcy and the same creditor still holds a lien against it to secure both borrowers' original liability on the same loan.[19]

As both counsel pointed out, there is very little published case law addressing the application of the lien stripping under Chapter 13 to a claim on which a non-filing co-borrower remained liable. More to the point, there is no decision treating the situation where a debtor in bankruptcy acquired the full fee or title in the collateral by conveyance from the non-filer pre-petition. In *In re Alvarez*, 733 F.3d 136 (4th Cir. 2013) and *In re Erdmann*, 446 B.R. 861 (Bankr. N.D. Ill. 2011), the collateral in question was owned by spouse-couples in tenancy by the entirety, when the lien stripping remedy was invoked. In *Alvarez*, only one of the spouse-owners filed for bankruptcy. The bankruptcy court had determined that lien stripping was not available when "only the debtor's interest in the entireties property, rather than the whole of the property," was under the jurisdiction of the bankruptcy court and thus subject to bankruptcy remedies. 733 F.3d at 141. The district court and the Fourth Circuit affirmed, on the same analysis. 733 F.3d at 141-142.

In *Erdmann*, both spouse-owners were joint debtors in the case before the court, but only one of them was eligible to receive a discharge under Chapter 13. The bankruptcy court denied confirmation of a plan that provided for lien-stripping of a junior mortgage. The threshold

---

[19]This notion is separately lodged in 11 U.S.C. § 524(e), discussed *infra* at 14-15.

ruling was that the final effect of lien stripping in Chapter 13 is dependent upon a right to discharge and an actual grant of discharge in the case. 446 B.R. at 868. Thus, the husband-debtor could not get the mortgage lien divested from his interest as a tenant by the entireties; and because under Illinois law "[t]enancy by the entirety simply does not provide for a lien against the property as to only one spouse," the mortgage lien could not be stripped as to the wife-debtor's interest alone. 446 B.R. at 869.

*Alvarez* and *Erdmann* are distinguishable from this case, not the least on the vagaries of the legal analysis required by the applicable state law. Both cases featured property held in tenancy by the entireties, which has specific governing principles of ownership. These included the underlying notion of a single marital unity in legal personhood between husband and wife--which became the keystone of their rejection of the remedy, regardless of whether one spouse's interest was outside of bankruptcy jurisdiction and administration (*Alvarez*) or under it (*Erdmann*). As an estate in land, tenancy by the entireties has never been recognized in Minnesota law. *Semper v.* Coates, 100 N.W. 662, 662 (Minn. 1904); *Wilson v. Wilson*, 45 N.W. 710, 711 (Minn. 1890). *Alvarez* is also distinguishable under the argument of the Debtor here, because the title to the property there remained in both spouses and hence a fractional interest lay outside the bankruptcy estate.

The parties here discussed one other decision that also differs from this case on the status of title to the subject property as of the bankruptcy filing; but another part of its analysis bolsters the outcome here. In *In re Leonard*, 307 B.R. 611 (Bankr. E.D. Tenn. 2004), lien stripping was invoked against an automobile lender's interest in its collateral. The debtors' plan, confirmed by the court, provided for a write-down of the lender's secured claim.[20] The debtors had completed payment under their plan and received discharge. The lender had received the full amount of its secured claim plus interest and a composition payment on the unsecured portion of its claim. A

---

[20] Since the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, nearly a decade ago, the write-down of secured claims on lending for purchases of motor vehicles has been severely limited by the so-called "910" provision in the "hanging paragraph" after 11 U.S.C. § 1325(a)(9).

13

portion of the underlying debt remained unpaid and was discharged as to the debtors. A non-spouse co-signer and co-owner on the motor vehicle did not go through Chapter 13 and remained liable on the deficiency. After the lender asserted rights against the motor vehicle as collateral in consequence of the continuing liability of the co-signer and co-owner, the debtors made a motion to have the lender compelled to release its lien of record.

At first glance, *Leonard* seems distinguishable from the matter at bar because the non-filing co-signer remained in title throughout. Thus, *Leonard*'s facts did not give as much of an opening to argue *Johnson v. Home State Bank*.[21] The bankruptcy court held that the lender retained a lien against the vehicle to secure the co-signer's nondischarged liabilities; and because the lender was not obligated to release its lien as to that pledge of *that* party's property interest until it was paid in full, 11 U.S.C. § 524(e), it could not be compelled to do so on motion of the debtors. 307 B.R. at 614.

Notwithstanding the different post-bankruptcy status of ownership, *Leonard* speaks to the matter at bar in the latter point--the survival of a lien granted by a party not in bankruptcy. This distinction shunts this case away from an abstract application of §§ 101(5) and 102(2), *supra*, 7-8. *Leonard* thus supports the proposition that nonrecourse secured claims subject to modification are limited to those created by the original grant *of the debtor in bankruptcy*. After that, the survival and continuing enforceability of a lien jointly granted pre-petition by a non-filing co-obligor come to the fore.

This is reinforced by other aspects of the lien stripping remedy. Under various sources of local governance, lien stripping as to a junior mortgage lien is not fully effectuated until grant of discharge, or at least until *the debtor* has gained the right to receive a discharge by completing payment under a confirmed plan. *In re Schmidt*, 765 F.3d at 879 (junior mortgage not attached to value in collateral may be avoided "entirely" upon grant of discharge under Chapter 13). Loc. R. Bankr. P. (D. Minn.) 3012-1(f) (after debtor's completion of payments under plan, debtor

---

[21] And, it appears, the debtors in *Leonard* did not even make an argument based on *Johnson* anyway.

14

may obtain supplemental relief for release of junior mortgage from the property, if mortgagee does not voluntarily release lien). *Cf. In re Scheierl*, 176 B.R. 498, 504 (Bankr. D. Minn. 1995) (effectuation of lien-stripping under Chapter 13 "has to await the debtor's full performance" in payment under confirmed plan).[22]

Beyond that, there is the prominent statutory feature mentioned earlier: a grant of discharge "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). To be sure, the Debtor's ex-husband--another "entity" in the sense of the statute--did not even have an interest in the subject property when the Debtor filed under Chapter 13, and he certainly would not have one when a discharge was granted in this case. However, his interest had passed to the Debtor subject to the encumbrance he had granted to HomeTown, and HomeTown has never released or satisfied that encumbrance. Under the state-law analysis above, it is still as live and enforceable as the one at issue in *Leonard*.

This is why the Debtor's motion for valuation of HomeTown's claim is nugatory. Her plan provides for a release of HomeTown's lien in its entirety after she completes payments. The Debtor's motion is proffered as the platform for such comprehensive relief against the lien, to free the property entirely from HomeTown's mortgage. That release cannot be compelled or judicially imposed as to the persisting lien previously granted by her ex-husband, because that lien does not match to a claim that is subject to allowance and treatment under a plan or any other remedy under bankruptcy law, within this debtor's case. Because that relief cannot be granted in the end, there is no reason at this time to value the claim in the abstract as it relates to the undivided one-half interest against which the Debtor gave a mortgage lien. Nor can this plan be confirmed.[23]

---

[22] In an unpublished, terse order, the district court summarily reversed *Scheierl* on the sole ground that this court's analysis and ruling conflicted with the extant decision of another judge of the district court, *In re Lee*, 162 B.R. 217 (D. Minn. 1993). Nearly two decades later, *Schmidt* gave some vindication on the issue.

[23] And, frankly, it seems to make no sense at all for the Debtor to pursue the relief by halves--or, more properly, by *one*-half. Stripping the lien as to an undivided one-half interest will not free up the property from the second mortgage. Without that, somebody will have to account to HomeTown or HomeTown will be able to foreclose. And, there may be more abstruse substantive problems with trying to go through with such a partial divestment of lien, under the Minnesota state law governing joint tenancy and the grant of liens to property held in joint tenancy. The analysis in this decision was prompted by the

15

IT IS THEREFORE ORDERED:

1.  The Debtor's motion for the valuation of the claim of HomeTown Credit Union is denied.

2.  The Debtor's modified plan [Dkt. No. 12] is not confirmed.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

court's own initiative and it does not reach that dimension at all. Without full adversarial participation it is not warranted to examine such other implications.